UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JES FARMS PARTNERSHIP,<br><br>                              Plaintiff,<br><br>vs.<br><br>INDIGO AG INC.,<br><br>                              Defendant. | **4:23-CV-4023-LLP**<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL AND DENYING MOTION TO DISMISS** |

Pending before the Court is Defendant Indigo Ag, Inc.'s Motion to Compel Arbitration and Motion to Dismiss. (Doc. 28). For the following reasons, Indigo's Motion to Compel is granted in part and denied in part and its Motion to Dismiss is denied.

## BACKGROUND

Plaintiff JES Farms operates a 16,800 acre farm in Sully County, South Dakota, which raises grain, cattle, and other farm products. (Docs. 1, ¶ 6; 14, Huerter Decl., Ex. 1). Defendant Indigo Ag, Inc. ("Indigo") is an agriculture technology company headquartered in Boston, Massachusetts, with operations in Memphis, Tennessee. (Doc. 15, Lazarov Decl. ¶ 2). During all relevant times, Indigo operated the Indigo Marketplace—an internet-based platform that enabled farmers to market their crops to a network of purchasers using Indigo as an intermediary. (Doc. 15, Lazarov Decl. ¶ 3).

## I.      Marketplace Seller Agreement

JES Farms first entered the Indigo Marketplace on January 8, 2019, when it executed a Marketplace Seller Agreement ("MSA") with Indigo Marketplace, LLC, which enabled JES Farms to sell its crops through the Indigo Marketplace ("crop transactions"). (Doc. 1-3). Each crop transaction between JES Farms and Indigo on the Indigo Marketplace is "governed by th[e] Marketplace Settler Agreement." (Doc. 1-3). The Marketplace Seller Agreement provides the terms and procedures for JES Farms to transact in the Indigo Marketplace, including the process for submitting bids, accepting offers, and obtaining confirmations. (Doc. 1-3 at § 2). It also establishes the general pricing terms upon which JES Farms would be paid for the commodities it

1

sold. (Doc. 1-3 at § 6). Under the Marketplace Seller Agreement, payment is "contingent" upon Indigo's collection of the commodity or JES Farms' delivery of the commodity to the delivery location, and JES Farms' fulfillment of all obligations in a confirmation or addendum, including setting the futures reference price or accepting a basis bid. (Doc. 1-3 at § 6). The Marketplace Seller Agreement provides that it is "subject to Indigo's right to set-off any debts, claims or obligations from [JES Farms]" and that to the extent JES Farms "ha[s] any obligation due and owing to Indigo. . .Indigo may, at its option, deduct any such outstanding amounts from any payment to [JES Farms] for any transaction on the Indigo Marketplace." (Doc. 1-3 at § 6).

The Marketplace Seller Agreement has a Default and Indemnity provision which provides in relevant part that:

> The parties contemplate that Indigo will or may owe commodities to third-party buyers and that Your failure to deliver the Commodity, including any failure to deliver within in the delivery period, is a default and may result in damages to Indigo. . . In the event You fail to fulfill the sale of the Commodity as provided in the Confirmation, then Indigo may, at its option, (1) terminate the Agreement (or any particular transaction) without any further obligation thereof, along with any other contracts in existence with Seller; (2) cover by purchasing a commodity of similar quality as the Commodity in an amount equal to the shortfall, and You will pay Indigo an amount equal to the difference in the Purchase Price for the Commodity and the amount Indigo paid for the replacement commodity (if any); or (3) require Seller to pay fair market value for Indigo's interests in any defaulted portion, with fair market value to be determined in Indigo's reasonable discretion and to include the difference between the Purchase Price and the market price at the time of termination and any other losses incurred by Indigo as a result of default.

(Doc. 1-3 at § 6). The Marketplace Seller Agreement contained an Adequate Assurances clause which provided:

> Indigo shall have the right, when it has reasonable grounds for insecurity with respect to performance by You under a Confirmation, to demand adequate assurance of Your full performance thereunder. As adequate assurance, Indigo may demand payment from You up to an amount equal to the difference between the Confirmation prices for Commodities to be sold and delivered to Indigo and the prevailing market price for the total volume of the Commodity subject to such Confirmation. You shall provide such assurance within 48 hours of the receipt of the demand therefore.  Your failure to provide such adequate assurance as demanded shall constitute Your repudiation of the Confirmation, and Indigo shall have the right to declare you in default and pursue all available legal remedies, including, without limitation, recovery of losses and damages.

(Doc. 1-3). The Marketplace Seller Agreement also contained a Dispute Resolution Clause that provided:

> Except as otherwise provided herein, the Agreement and any addendum, or transactions under the Agreement, the Indigo Marketplace Platform or through Indigo Marketplace will be subject to National Grain & Fee Association ("NGFA") trade rules (the "Rules") in effect on the date thereof, and any dispute will be referred to NGFA arbitration in accordance with the Rules. The parties agree that the sole forum for resolution of all disagreements or disputes relating to crop transactions arising under the Agreement, the Indigo Marketplace or the Indigo Marketplace Platform between You and Indigo shall be arbitration proceedings before the NGFA pursuant to the Rules.

(Doc. 1-3).

Subsequent MSA's executed by JES Farms on April 17, 2019, May 29, 2020, June 3, 2020, and August 10, 2020, contained the exact same mandatory arbitration provision. (Docs. 15, Lazarov Decl. ¶ 7; 1-1-1-3). In the May, June, and August 2020 Marketplace Seller Agreements, the parties also agreed in the Dispute Resolution clause that the MSA "shall be governed by, and construed in accordance with, the laws of the State of Tennessee," which is the state where Indigo's commercial operations are based. (*Id.*)

## II.    Crop transactions under the Marketplace Seller Agreement

After executing the first Marketplace Seller Agreement in 2019, JES Farms entered into a series of contracts in which it agreed to sell millions of bushels of grain to Indigo through Indigo Marketplace. Many of those contracts utilized Indigo's Managed Pricing Programs ("MPP"). The MPP Addenda that JES Farm entered into incorporate the terms of the Marketplace Seller Agreement.[1] (Doc. 30, Brown Decl. Ex. 1). Indigo's managed pricing programs connect growers with grain marketing advisors who will use their marketing insights and expertise to establish a futures price on behalf of the grower." (Doc. 6 at 81) (citing *AgNews*, "Indigo Marketplace now offers pricing for grain transactions to help growers mitigate risk when selling grain to any location," https://news.agropages.com/News/NewsDetail---34335.htm.) (last visited February 22,

---

[1] The MPP Addenda provide that:

> This Addendum is binding on You and is subject to the terms and conditions of the Marketplace Seller Agreement between Indigo and You ("Agreement"), except that the Additional Terms below prevail in the event of a conflict with the terms of the Agreement with respect to the crops contemplated hereunder.

(Doc. 30, Brown Decl. Ex. 1).

2023)). In approximately January 2020, Indigo introduced "accumulators" to the MPP. Indigo advertised the accumulators as "giv[ing] you the potential to price bushels above the current market with the security of a floor price." (Doc. 7, Redd Aff., Ex. 7). JES Farms contends that Indigo had intended that its accumulators would not exceed the bushels provided in the contracts, but that Indigo's pricing desk allowed and accepted an unlimited amount of "buy" (call) and "sell" (put) accumulators under any given MPP, beyond the contracted grain amounts. (Docs. 1, ¶¶ 74-76; 7-15a).

In addition to MPPs, JES Farms also entered into a series of contracts that enabled JES Farms to obtain premium payments on commodities it had already committed to Indigo, on the condition that JES Farms agreed to sell additional commodities to Indigo under specific future market conditions (i.e., "Firm Offer Addenda"). (Doc. 30, Brown Decl. Ex. 2). Under these Firm Offer Addenda, JES Farms received premium payments on many grain sales to Indigo, and in return JES Farms agreed to sell additional specified volumes of corn or soybeans to Indigo at an Offer Price at a later time, if and when the market conditions set forth in the contract came into being. (Doc. 1, Ex. 4). The Firm Offer Addenda incorporate the terms of the Marketplace Seller Agreement.[2] (Doc. 30, Brown Decl. Ex. 2).

III.    JES Farms Alleged Failure to Provide Adequate Assurances

The pricing programs and strategy JES Farm executed was aggressive and required market prices to stay in a tight range. (Doc. 15, Lazarov Decl. ¶ 5). When market prices began to rise significantly starting in the fall of 2020, JES Farms' pricing strategy lost value as compared to simply selling the same grain elsewhere on a spot basis. (Doc. 15, Lazarov Decl. ¶ 5). Indigo became concerned that JES Farms would not honor its delivery contracts, which would expose Indigo to significant damages. (Doc. 15, Lazarov Decl. ¶ 5). To try to save the relationship and avoid arbitration, Indigo attempted to negotiate with JES Farms. (Doc. 15, Lazarov Decl. ¶ 5). The aim of the negotiations was to price out JES Farms' MPPs with Indigo agreeing to incur some

---

[2] The applicable provision in the Firm Offer Addenda provides:

> This Firm Offer Addendum (this "Addendum") is entered into by and between Indigo Marketplace, LLC ("Indigo") and Seller ("You"). This Addendum is binding on Indigo and You and forms part of, and is subject to the terms and conditions of, the Marketplace Seller Agreement between Indigo and You (the "Seller Agreement") including without limitation the dispute resolution provisions thereof.

(Doc. 30, Brown Decl. Ex. 2).

of the loss in exchange for JES Farms delivering the committed grain at agreed upon prices. (Doc. 15, Lazarov Decl. ¶ 5). On December 2, 2020, Indigo sent an email to JES Farms acknowledging previous discussions between the parties during which JES Farms indicated its intent to default on its delivery obligations under certain MPP contracts. (Doc. 7, Redd Aff. Ex. 14).

## IV.    Arbitration and Further Demand for Adequate Assurances

JES commenced NGFA arbitration on January 19, 2021, asserting Indigo had failed to make timely payment for the grain it delivered in 2020 in accordance with twenty-seven (27) grain contracts. (Docs. 15, Lazarov Decl. Ex. 3; 7, Redd Aff. Ex. 1).

After JES commenced the NGFA arbitration, seeking payment for grain it delivered, Indigo and JES signed a "National Grain and Feed Association Arbitration Services Contract Case Number 2874." (Doc. 7, Redd Aff. Ex. 9). In that contract, the parties:

> Agree to submit the following controversy to arbitration by the National Grain and Feed Association (NGFA) for resolution.
>
> The dispute concerns claims by JES Farms Partnership against Indigo Ag, Inc. involving multiple contracts for corn. JES Farms Partnership is currently claiming $215,000 in damages.

(Doc. 7, Redd Aff. Ex. 9). The contract provides that "[t]he parties agree to comply with all NGFA Arbitration Rules. . . ." (Doc. 7, Redd Aff. Ex. 9). Indigo and JES signed the NGFA Service Contract on May 23, 2021. (Doc. 7, Redd Aff. Ex. 9).

That same day, Indigo issued an email to JES Farms referencing its January 12, 2021 email to JES Farms reminding it of its delivery obligations for soybeans and stating that it would provide JES Farms a cancellation notice if it did not commit to delivery on the indicated contracts. (Doc. 7, Redd Aff. Ex. 16). The email indicated that Indigo had attempted to follow up again by phone and text, but had received no response or communication from JES Farms except from its agent, Jeremy Frost of Fearless Grain Marketing, LLC, who informed Indigo that JES Farms did not intend to deliver on the contracts. (Doc. 7, Redd Aff. Ex. 16). Indigo indicated that it would be cancelling the contracts, that JES Farms had additional open corn contracts with Indigo, and if Indigo did not receive communication from JES Farms indicating its intent to fulfill the corn contracts, Indigo would cancel those contracts as well. (Doc. 7, Redd Aff. Ex. 16). JES Farms claims Jeremy Frost is the agent of Indigo and Indigo claims Frost to be the agent of JES Farms.

On January 29, 2021, Indigo sent a "Final Notice" email with copy via Fedex to JES Farms acknowledging receipt of JES Farms' NGFA arbitration claim and indicating that it would be asserting its own counterclaims. (Doc. 15, Lazarov Decl. Ex. 4). Therein, Indigo gave JES Farms until February 2, 2021, to commit to fulfilling its contractual obligations and instructed JES Farms to call immediately if it wanted to discuss further options. (Doc. 15, Lazarov Decl. Ex. 4). Indigo informed JES Farms that if it failed to hear from JES by the date specified, or if JES otherwise confirmed its intent not to deliver, Indigo would cancel all remaining open contracts. (Doc. 15, Lazarov Decl. Ex. 4).

On February 19, 2021, Indigo sent a "Notice of Default" email with copy via U.S. Mail to JES Farms providing formal Notice of Default as to all contracts listed on Schedule A attached thereto. (Doc. 7, Redd Aff. Ex. 23). Indigo indicated that it had not received any assurance from JES Farms as to performance despite numerous requests and that JES Farms stopped delivering on many contracts without explanation. (Doc. 7, Redd Aff. Ex. 23). Indigo indicated that it was attempting to mitigate damages on the contracts and that it would be asserting NGFA claims against JES Farms for resulting damages. (Doc. 7, Redd Aff. Ex. 23).

On July 30, 2021, Indigo served an Answer and Counterclaim in the NGFA arbitration. (Doc. 7, Redd Aff. Ex. 11). In its Counterclaim, Indigo alleges that JES Farms defaulted on 49 of the 77 contracts it entered into with Indigo and failed to deliver any commodities whatsoever under 40 of those defaulted contracts. (Doc. 7, Redd Aff. Ex. 11). The Marketplace Seller Agreement grants Indigo "the right. . . to demand adequate assurance of JES's full performance" whenever it has "reasonable grounds for insecurity." Indigo alleges that it was provided reasonable grounds for insecurity by JES's short strategy that caused its equity positions in its program to deteriorate, and market movements that caused JES's Firm Offer Addenda contracts to seem a near certainty to "fill," thus requiring JES to deliver substantial additional volumes of commodities to Indigo. (Doc. 7, Redd Aff. Ex. 11). Indigo alleges that that in response to Indigo's demands for adequate assurances, JES refused to commit that it would deliver the commodities that it was contractually bound to deliver; that JES's "failure to provide such adequate assurance" constituted JES's "repudiation of the Confirmation," thus giving Indigo the right under the MSA to declare JES Farms in default and "pursue all available legal remedies, including without limitation, recovery of losses and damages." (Doc. 7, Redd Aff. Ex. 11). Indigo alleges that under the terms of the

6

Marketplace Seller Agreement, to the extent JES has any obligation due and owing to Indigo on any contracts that it did perform, it "is subject to Indigo's right to set-off any debts, claims or obligations from [JES]" and that "Indigo may, at its option, deduct any such outstanding amounts from any payment to [JES] for any transaction on the Indigo Marketplace." (Doc. 7, Redd Aff. Ex. 11). Indigo alleges that under the terms of the Marketplace Seller Agreement, "JES had defaulted on numerous agreements by not delivering commodities it contracted to deliver, and by not providing adequate assurances with respect to certain other outstanding contracts. These defaults authorized Indigo to cancel all of JES's other contracts, and require JES to pay Indigo the costs Indigo incurred to cover by purchasing a commodity of similar quality as the Commodity in the amount equal to the shortfall, among other remedies. (Doc. 7, Redd Aff. Ex. 11).

JES's Reply to Indigo's counterclaims was served on September 21, 2021. (Doc. 7, Redd Aff. Ex. 12). Indigo filed a Surrebuttal on November 4, 2021. (Doc. 7, Redd Aff. Ex. 13). A single-day arbitration hearing was scheduled for some time during the week of December 6-8, 2022. (Doc. 7, Redd. Aff. Ex. 17). On October 31, 2022, Indigo's counsel requested the arbitration hearing be postponed. (Doc. 7, Redd Aff. Ex. 17). The NGFA granted Indigo's counsel's request on November 11, 2022. (Doc. 7, Redd. Aff. Ex. 17).

On November 8, 2022, before the NGFA canceled the first hearing and before a new hearing was scheduled, JES requested that an oral hearing on its claims be scheduled after March 2023, and informed the NGFA of its objection to Indigo's counterclaims and asserted that JES did not and had not agreed to arbitrate the same and that the NGFA lacked jurisdiction to hear or rule on Indigo's counterclaims. (Doc. 7, Red Aff. Ex. 18).

On December 7, 2022, the NGFA scheduled the one-day arbitration hearing for March 8, 2023, in Virginia. Despite JES's objection, the NGFA did not address JES's concerns about the arbitrability issue. Instead, on December 22, 2022, the NGFA inquired whether JES intended to proceed with the hearing and asked for a response by January 6, 2023. (Doc. 7, Red Aff. Ex. 19). On January 5, 2023, JES again informed the NGFA that JES did not agree to arbitrate Indigo's counterclaims, questioned the NGFA's jurisdiction to consider the same, and asked the NGFA to advise whether it intended to hear Indigo's counterclaims at arbitration. (Doc. 7, Redd Aff. Ex. 20).

The NGFA responded to JES Farms' January 5, 2023, correspondence on January 13, 2023. (Doc. 7, Redd Aff. Ex. 21). In its letter, the NGFA stated that:

> With respect to questions about what claims will be addressed in these proceedings – it has been over 14 months since the parties submitted their final arguments and nearly 7 months that NGFA has been attempting to schedule these hearings. Pursuant to the NGFA Arbitration Rules, the parties have had the opportunity to respond to the merits of each other's arguments and claims, and it should be clear that the case has been presented to the committee as submitted by the parties.

(Doc. 7, Redd Aff. Ex. 21).

### V.    Federal Lawsuit

On February 13, 2023, JES Farms filed a complaint against Indigo Ag, Inc. in this Court. (Doc. 1). In Count I, JES seeks a declaratory judgment from the Court that Indigo's counterclaims are not arbitrable. In Count II, JES seeks a declaratory judgment declaring the MPP grain contracts to be illegal off-market exchange under the Commodity Exchange Act. In Count 3, JES seeks an order from the Court staying the arbitration of Indigo's counterclaims. JES moved for a temporary restraining order and a preliminary injunction prohibiting Indigo from submitting its counterclaims to the NGFA arbitration.

On February 16, 2023, the Court held a telephonic status conference during which the parties apprised the Court of the primary issues underlying the arbitrability of Indigo's counterclaims and JES's request for a temporary restraining order. The Court ordered that the parties file simultaneous briefs setting forth their arguments regarding the arbitrability issue and these briefs were filed on February 27 and 28, 2023. (Docs. 5, 6, 12). The Court held a telephonic hearing on JES's request for temporary restraining order on March 2, 2023. (Doc. 18). The Court ordered additional briefing on the applicability of *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) and these briefs were filed on March 3, 2023. (Docs. 19, 20).

On March 6, 2023, the Court issued an opinion entering a temporary restraining order staying the one-day arbitration set for March 8, 2023, before the National Grain & Feed Association (NGFA). (Doc. 21). On March 31, 2023, Defendant Indigo Ag, Inc. filed a Motion to Compel Arbitration and Motion to Dismiss. (Doc. 28). This motion has been fully briefed and is presently pending before the Court.

## DISCUSSION

Pending before the Court is Motion to Compel Arbitration filed by Defendant Indigo Ag, Inc. ("Indigo") and a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. At issue before the Court in this Motion to Compel is whether Indigo Ag has standing to enforce the arbitration agreement and whether the parties agreed to arbitrate issues regarding the validity and scope of the arbitration clause, and the legality of the MPP contracts.

## I.   Does Indigo Ag have standing to enforce arbitration agreement?

The Marketplace Seller Agreements were between Indigo Marketplace, LLC and JES Farms. JES Farms argues that Plaintiff, Indigo Ag, Inc., does not have standing to enforce the arbitration provision because it was not a signatory to the Marketplace Seller Agreement. (Doc. 32 at 874-75).

A nonsignatory can enforce an arbitration clause against a signatory to the agreement in several circumstances. *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005). One is when "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *Id.* (citing *MS Dealer Serv. Corp. v. Franklin* 177 F.3d 942, 947 (11th Cir. 1999)). Another is "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." *Id.* (citing *MS Dealer Serv. Corp.*, 177 F.3d at 947). "When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate." *Id.* (citing *MS Dealer Serv. Corp.*, 177 F.3d at 947).

The Court finds that both circumstances are present in this case. The relationship between Indigo Ag, Inc. and Indigo Marketplace is a close one. Indigo Ag, Inc. is the sole member of Indigo Marketplace, LLC. (Doc. 38-1). As in *CD Partners*, "[e]visceration of the underlying arbitration agreement will be avoided only by allowing [Indigo Ag, Inc.] to invoke arbitration." *Id.* at 799-800. In addition, Count 1 of JES Farms' complaint relies upon the existence of the Marketplace Seller Agreement, and specifically the arbitration clause therein because it seeks a

9

declaratory judgment from the Court that Indigo Ag, Inc.'s counterclaims are not arbitrable. Indigo Ag, Inc. therefore has standing to enforce the arbitration agreement.

## II.  Validity and scope of arbitration clause

### A.  Overview

In Count I of JES Farms' complaint, JES Farms alleges that it did not agree to arbitrate Indigo's counterclaims and seeks a declaratory judgment from this Court that the arbitration clause in the Marketplace Seller Agreement is invalid and unenforceable.  JES Farms also argues that Indigo's counterclaims are not encompassed by the arbitration clause in the Marketplace Seller Agreement or by the Arbitration Services Agreement entered into between the parties.

In Count 2, JES alleges that Indigo's MPP grain contracts are illegal off-market exchange under the Commodity Exchange Act and are thus unenforceable.

Indigo argues that under the terms of the Marketplace Seller Agreement and the Arbitration Services Contract entered into between the parties, they agreed to submit to arbitration issues regarding the validity and scope of the arbitration clause and the legality of the MPP contracts.

### B.  Legal Standard

Two questions are pertinent when ruling on a motion to compel arbitration: (1) whether the parties entered a valid arbitration agreement, and (2) if so, whether the parties' particular "dispute falls within the scope of the arbitration agreement." *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873 (8th Cir. 2018). State contract law governs whether an arbitration agreement exists or is valid. *Lyster v. Ryan's Family Steak Houses, Inc.*, 239 F.3d 943, 946 (8th Cir. 2001).  Whether a dispute falls within the scope of an arbitration agreement is governed by federal substantive law of arbitrability. *Parm*, 898 F.3d at 873.  "The scope of an arbitration agreement is given a liberal interpretation, with any doubts resolved in favor of arbitration." *MedCam, Inc. v. MCNC*, 414 F.3d 972, 974 (8th Cir. 2005).  A motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.*  When, as here, the parties submit affidavits in conjunction with a motion to compel arbitration, the district court treats the motion akin to a motion for summary judgment, viewing the record in the light most favorable to the nonmovant.  *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 403 (8th Cir. 2021) (citing *Nebraska Machinery Co. v. Cargotec*

*Solutions, LLC*, 762 F.3d 737, 741-42 (8th Cir. 2014) (explaining that such treatment is warranted where the parties rely on matters outside the pleadings)).

### C. Analysis

#### 1. Applicability and Supremacy of Federal Arbitration Act

The Marketplace Seller Agreement provides that it is to be governed by and construed in accordance with Tennessee Law. In its memorandum in opposition to JES Farms' request for temporary restraining order, Indigo argued that T.C.A. § 29-5-302 is preempted by the FAA because the parties' contracts involved interstate commerce. (Doc. 12 at 614). Under T.C.A. § 29-5-302(a), arbitration clauses in contracts "relating to farm property, structures or goods, or to property and structures utilized as a residence of a party, the clause providing for arbitration shall be additionally signed or initialed by the parties." T.C.A. § 29-5-302 (2021). In Count I, JES Farms argues that the arbitration clause in the Marketplace Seller Agreement is invalid and unenforceable. JES Farms alleges that the grain contracts at issue in Indigo's counterclaim relate to farm property and/or farm goods, and that, in violation of Tennessee law, JES Farms has not signed or initialed the arbitration clause in the Marketplace Seller Agreement. Although the Court did not explicitly analyze this argument in its March 6, 2023, Temporary Restraining Order staying the parties' arbitration set for March 8, 2023, the Court did state in its order that the arbitration agreement was enforceable if the MPP contracts are found to be crop transactions and not illegal off-market exchange subject to regulation by the SEC. (Doc. 21 at 807).

"The Federal Arbitration Act 'create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *Donaldson Co., Inc. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731 (8th Cir. 2009) (quoting *Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA provides that a written agreement to arbitrate disputes arising out of contracts involving maritime or interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 835 (8th Cir. 1997) (citing 9 U.S.C. § 2). The FAA applies to arbitration agreements that fall within its coverage and which, as is the case here, are subject National Grain & Feed Association ("NGFA") trade rules. *See Richland Grain, Inc. v. White Commercial Corp.*, Civ. No. 8:03-182, 2003 WL 22722419, at *1 (D. Neb. Nov. 19, 2003) (citing *Nagel v. ADM Investor Servs., Inc.*, 1998 WL 25208 (N.D. Ill.

1998); *Hoffman v. Cargill, Inc.*, 236 F.3d 458 (8th Cir. 2001)). Whether or not the FAA applies in this case is a question for this Court. *See New Prime Inc. v. Oliveira*, 139 S.Ct. 532, 537-38 (2019).

The Court agrees that the transactions at issue in this case involve interstate commerce and that the Federal Arbitration Act applies. In cases where the FAA applies, "courts may not invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Statutes that require arbitration clauses to include additional requirements that do not apply to other contracts, such as the additional initial and signature requirements required in Tenn. Code Ann. § 29-5-302(a), are in direct conflict with the FAA and are therefore preempted. *See id.*; *Hubert v. Turnberry Homes, LLC*, Civ. No. M2005-00955-COA-R3-CV, 2006 WL 2843449 at *6 (Tenn. Ct. App. 2006) ("Section 2 of the FAA preempts Tenn. Code Ann. § 29-5-302(a) in cases involving written agreements to arbitrate disputes arising out of maritime transactions or contracts affecting interstate commerce."). Accordingly, this Court finds that the arbitration clause in the Marketplace Seller Agreement is valid and enforceable.

### 2. By incorporating the NGRA Rules in the Marketplace Seller Agreement, did the parties agree to arbitrate Count 2 concerning the legality of the MPP contracts?

In Count 2, JES alleges that Indigo's MPP grain contracts are illegal off-market exchange under the Commodity Exchange Act and are thus unenforceable.

Indigo argues that by incorporating the NGFA Trade Rules into the Marketplace Seller Agreement, JES Farms agreed to submit the issue of illegality of the MPP contracts to the arbitrator. Unless the arbitration clause "clearly and unmistakably" evidences the parties' intent to give the arbitrator the power to determine arbitrability, the question is left for judicial determination. *AT & T Tech., Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986); *see also Express Scripts, Inc. v. Aegon Direct Marketing Services, Inc.*, 516 F.3d 695, 700 (8th Cir. 2008) (citing *AT & T Tech., Inc.*, 475 U.S. at 649) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so.")).

The dispute resolution provision in the Marketplace Seller Agreement specifically incorporates the NGFA trade rules as follows:

> [T]he Agreement and any addendum, or transactions under the Agreement, the Indigo Marketplace Platform or through Indigo Marketplace will be subject to National Grain & Feed Association ("NGFA") trade rules (the "Rules") in effect on the date thereof, and any dispute will be referred to NGFA arbitration in accordance with the Rules.

(Doc. 15, Lazarov Decl. Ex. 1). Rule 29 of the NGFA Trade Rules states:

> Rule 29. Arbitration
>
> Where a transaction is made subject to these rules in whole or in part, whether by express contractual reference or by reason of membership in this Association, then the sole remedy for resolution of any and all disagreements or disputes arising under or related to the transaction shall be through arbitration proceedings before the National Grain and Feed Association pursuant to the NGFA Arbitration Rules; provided, however, that at least one party to the transaction must be a NGFA member[3] entitled to arbitrate disputes under the NGFA Arbitration Rules.

(Doc. 14, Huerter Decl. Ex. 7 at 522). Citing in *Green v. SuperShuttle Int'l Inc.*, 653 F.3d 766, 769 (8th Cir. 2011), Indigo argues that by expressly incorporating the NGFA Trade Rules in the Marketplace Seller Agreement, JES Farm expressly agreed to arbitrate any issues "relating to" the contract, including issues regarding the legality of the contracts.

The Court finds that *Green* is distinguishable from the facts of this case. The arbitration clause in *Green* specifically incorporated by reference the commercial rules and procedures of the American Arbitration Association, including Rule 7(a) which "clearly and unmistakably" allows the arbitrator to determine threshold questions of arbitrability. *See Green*, 653 F.3d at 769 (citing *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009)). Rule 7(a) of the American Arbitration Association's Commercial Arbitration Rules and Mediation Procedures provides as follows:

> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.

---

[3] Indigo asserts that it is an NGFA member.

American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) (2022), https://www.adr.org/sites/default/files/CommercialRules_Web_0.pdf.  Incorporation of the American Arbitration Association's Rules, including Rule 7(a), is without question a "clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court." *Fallo*, 559 F.3d at 878.  By contrast, Rule 29 of the NGFA does not specifically reference the parties' intent to submit to arbitration matters regarding the existence, scope, or validity of the arbitration agreement.  Accordingly, these issues are properly before this Court.

### D. Does the arbitration clause in the Marketplace Seller Agreement encompass Count 2 concerning the legality of the MPP contracts?

Indigo also argues that the arbitration clause in the Marketplace Seller Agreement covers questions regarding the legality of the MPP contracts.  In determining whether the parties agreed to arbitrate the question of legality of the MPP contracts, the Court must first determine whether the arbitration clause is broad or narrow. *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 874 (8th Cir. 2018).  If the clause is broad, the liberal federal policy favoring arbitration agreements requires that a district court send a claim to arbitration as long as the underlying factual allegations relate to matters covered by the arbitration provision. *Id.*; *see also United Steelworkers of Am. v. Duluth Clinic, Ltd.*, 413 F.3d 786, 789 (8th Cir. 2005) ("[I]f the clause is broad . . . the court analyze[s] whether the dispute relates to the subject matter of the agreement.").  If the clause is narrow, then the court determines "whether the dispute involves an agreement collateral to the agreement containing the arbitration clause." *United Steelworkers of Am*, 413 F.3d at 789 (quoting *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997)).

In *Parm v. Bluestem Brands, Inc.*, the Eighth Circuit stated that "[a]rbitration clauses covering claims 'arising out of' or 'related to' an agreement are broad." 898 F.3d at 874.  The court stated that "[s]uch a provision constitutes the broadest language the parties could reasonably use to subject their disputes to that form of settlement, including collateral disputes that relate to the agreement containing the clause." *Id.* (citation omitted).  A similar arbitration provision was at issue in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442 (2006).  There, the parties not only agreed to arbitrate "any claim, dispute, or controversy . . . arising from or relating to this Agreement," but also specifically agreed to arbitrate "the validity, enforceability, or scope of [the] Arbitration Provision or the entire Agreement." *Id.*

In the present case, the arbitration clause in the Marketplace Seller Agreement is much narrower than that in the *Parm v. Bluestem* and *Buckeye Check Cashing* because it does not encompass all claims or controversies relating to the agreement entered into between the parties, but rather only "disagreements or disputes relating to crop transactions." In deciding whether arbitration of the legality of the MPP contracts falls within the scope of the arbitration provision in the Marketplace Seller Agreement, the Court will examine a few other cases within the Eighth Circuit and cases cited with approval by the Eighth Circuit.

*CD Partners, LLC v. Grizzle*, 424 F.3d 795 (8th Cir. 2005) involved an arbitration clause in a franchise agreement that was worded to cover "any claim, controversy or dispute arising out of or relating to Franchisee's operation of the Franchised business under the Agreement." *Id.* at 800. At issue before the Court of Appeals was whether the arbitration clause was broad enough to encompass the tort claims alleging negligence in nine specific ways—all related to the operation of the franchises. *Id.* at 798. The court stated that broadly worded arbitration clauses such as the one at issue in *CD Partners* are "generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to the agreement." *Id.* at 800. Ultimately, the court held that the tort claims were subject to the arbitration clauses because they "had their genesis in, arose out of, and related to [the plaintiff's] operation of the franchises under the franchise agreements." *Id.* at 801.

In *CD Partners*, the Eighth Circuit Court of Appeals examined a case from the Tenth Circuit, *P & P Indus. v. Sutter Corp.*, 179 F.3d 861 (10th Cir. 1999) and a case from Eleventh Circuit Court of Appeals, *Gregory v. Electro-Mechanical Corp.*, 83 F.3d 382 (11th Cir. 1996). In *P& P Industries, Inc.*, the parties entered an exclusive agency agreement granting P & P the right to exclusively represent Sutter products in a certain geographical area. 179 F.3d at 864. At some point, Sutter became aware that P & P had misappropriated Sutter revenue. *Id.* Sutter unilaterally terminated the agreement and allegedly contacted all of P & P's employees and urged them to resign from P & P and to sign on with Sutter. *Id.* at 864. P & P filed a complaint in federal district court seeking compensation for Sutter's unilateral breach of the agreement, and for various alleged tortious actions, such as tortious interference with P & P's contract rights. *Id.* Sutter moved the court to stay the proceedings pending arbitration. *Id.* The parties' agreement contained a broad

arbitration clause which provided that "any controversy, claim or breach arising out of or relating to this Agreement" shall be arbitrable. *Id.* at 871.

The district court granted Sutter's motion to staying proceedings, ruling that all of P & P's claims were arbitrable under the agreement. *Id.* The arbitrator issued an award, finding that Sutter had the right to terminate the agreement as it did and that P & P's tort-based claims were without merit. *Id.* at 865. P & P filed amotion to vacate the award. The district court denied P & P's motion to vacate, reaffirming its earlier decision that all of P & P's claims, not just the breach of contract claims, were arbitrable, and ruling that the arbitrator had not exceeded his authority by ruling on the tort-based claims. *Id.*

The Tenth Circuit affirmed on appeal. It agreed with the district court that the purported interference with P & P's contracts with its employees and its relationship with third parties "each relate to the primary claim that Sutter breached the agreement by terminating it. It is the manner in which that termination occurred that forms the basis for the additional causes of action." *Id.* at 872.

In *Gregory v. Electro-Mechanical Corp.*, also cited by the Eighth Circuit in *CD Partners*, the Eleventh Circuit addressed a provision in a stock purchase agreement which provided for arbitration of all disputes "arising hereunder." 83 F.3d at 383-84. The court held that the arbitration clause required arbitration not only of the seller's contract claims, but of all claims asserted in the seller's complaint—including fraud, fraudulent inducement, deceit, misrepresentation, conversion, breach of good faith and fair dealing, and outrage. *Id.* at 384-86. The court reasoned that "although couched in various terms and theories of action, the very claim in th[e] complaint targets the fact that the plaintiffs did not receive the amount of money that they thought they should have for their stock and that the defendant buyer caused the loss." *Id.* at 384. The court stated that "[i]f the buyer had fully complied with the contract, as interpreted by the plaintiffs, there would be no tort claims" and that "all of [the] claims depend on [the defendant's] failure to fulfill its perceived obligations in connection with the sale of stock." *Id.* at 384-85.

In *3M Company v. Amtex Security, Inc.*, 542 F.3d 1193 (8th Cir. 2008), Amtex entered into a contract with 3M to become an integrated service provider providing various administrative, technical, and professional services to one of 3M's production plants. *Id.* at 1195. The contract involved an arbitration clause which mandates arbitration "[i]n the event [the parties] cannot agree

on any of the following: a) whether a variation has occurred; b) the cause of any variation; or c) the value of a change order amendment." *Id.* at 1199. Almost immediately after entering the agreement, the parties began to disagree about the scope of services Amtex was required to provide. *Id.* Ultimately, the parties terminated the agreement, leaving Amtex with unpaid vendor invoices of approximately $1.2 million. *Id.*

Amtex filed a lawsuit in federal court alleging unjust enrichment, breach of contract, breach of the duties of good faith and fair dealing, tortious interference with contract, and fraudulent inducement. *Id.* 3M filed a demand for arbitration which the district court granted. *Id.* at 1197, 1199. On appeal, Amtex argued that the district court erred in compelling arbitration because the arbitration clause had a narrow scope which applied only to disputes arising from the quarterly review process or from written changes to the scope of services. *Id.* at 1198. 3M responded that its arbitration clause was broad, encompassing "all disputes regarding monies allegedly owed to [Amtex] in connection with its work at the Greenville Plant" and that all of Amtex's claims come within the scope of the arbitration clause. *Id.*

The Eighth Circuit Court of Appeals held that the clause was broad. It stated that:

> While the clause is not as extensive as clauses which require arbitration of "any" or "all" disputes, the parties' definitions of terms such as "change" and "change order amendment" indicate that they agreed to arbitrate a very broad range of disputes regarding the existence, cause, or value of any change to the scope of services Amtex agreed to provide at the plant.

*Id.* at 1199. The court upheld the district court's ruling compelling arbitration. *Id.* at 1999-2000. The court found that "[e]ach of the nine claims in Amtex's amended complaint includes factual allegations regarding the scope of services, the costs incurred by Amtex in providing those services, its right to receive an equitable adjustment for changes to the scope of services, or 3M's alleged withholding of payments for services." *Id.*

In the present case, the arbitration clause in the Marketplace Seller Agreement is much narrower than that in *Parm v. Bluestem; Buckeye Check Cashing; CD Partners; P & P Indus. v. Sutter Corp.;* and *Gregory v. Electro-Mechanical Corp.* because it does not encompass all claims or controversies arising under and/or relating to the agreement entered into between the parties, but rather only "disagreements or disputes relating to crop transactions." The arbitration provision in the Marketplace Seller Agreement states that:

> The sole forum for resolution of all disagreements or disputes relating to crop transactions arising under the Agreement, the Indigo Marketplace or the Indigo Marketplace Platform between You and Indigo shall be arbitration proceedings before the NGFA pursuant to the Rules.

(Doc. 15, Lazarov Decl. Ex. 1 at 725). The agreement does not explicitly define "crop transactions," however, other provisions of the Marketplace Seller Agreement indicate that a crop (or commodity) transaction relates to JES Farms' sale and Indigo's purchase of commodities on the Indigo Marketplace. The Marketplace Seller Agreement provides:

> Pursuant to Your enrollment in the Indigo Marketplace, You, as seller or as an agent of the seller ("You," or "Seller"), may sell to Indigo Ag. Inc. ("Indigo"), and Indigo may buy from You, certain commodities (the commodity subject to each transaction, the "Commodity") in one or more transactions on the Indigo Marketplace, each of which will be governed by this Marketplace Seller Agreement (the "Agreement").

(Doc. 15, Lazarov Decl. Ex. 1 at 723). The MSA further provides that "[t]his Agreement will govern all Your transactions on the Indigo Marketplace in relation to Your sale and Indigo's purchase of a Commodity." (Doc. 15, Lazarov Decl. Ex. 1 at 723).

The Court finds that the arbitration clause in the Marketplace Services Agreement does not encompass Count 2 regarding the legality of the MPP contracts. Whether or not the MPP contracts are illegal off-market exchange under the Commodity Exchange Act is not a dispute relating to a purchase and sale transaction of a commodity on the Indigo Marketplace. Unlike in *Gregory*, this issue does not depend upon any failure by the parties of their obligations regarding the purchase and sale of commodities on the Indigo Marketplace. *See Gregory*, 83 F.3d at 385 ("All of these claims depend upon EMC's failure to fulfill its perceived obligations in connection with the sale of stock."). The issue presented in Count 2 would exist even if the parties had fully complied with the contract. *See id.* at 384 ("If the buyer had fully complied with the contract, as interpreted by the plaintiffs, there would be no tort claims.").

### 3. Does the Arbitration Services Contract encompass Indigo's counterclaims and whether the issue regarding the legality of the MPP contracts?

In January 2021, JES Farms filed a NGFA Arbitration Complaint Form against Indigo. In the letter detailing the complaint, JES Farms alleged that: (1) Indigo made late payments or underpayments on grain delivered by JES Farms; (2) Indigo altered its contracts with JES Farms; (3) Indigo did not allow "offsets" in the accumulators JES Farms used in its Managed Pricing

Program; (4) Indigo did not allow JES Farms to "price" its grain; (5) Indigo was not providing JES with elevator tickets.  (Doc. 15, Lazarov Decl. Ex. 3).

In April of 2021, JES Farms and Indigo executed an Arbitration Services Contract.  (Doc. 7, Red Aff. Ex. 9).  In that contract, the parties:

> Agree to submit the following controversy to arbitration by the National Grain and Feed Association (NGFA) for resolution.
>
> The dispute concerns claims by JES Farms Partnership against Indigo Ag, Inc. involving multiple contracts for corn.  JES Farms Partnership is currently claiming $215,000 in damages.

(Doc. 7, Red Aff. Ex. 9).  The contract provides that "[t]he parties agree to comply with all NGFA Arbitration Rules. . . ."  (Doc. 7, Red Aff. Ex. 9).  Rule 2(A) of the NGFA Arbitration Rulees provides that:

> (A) To commence a case, a complaint must be submitted by the plaintiff to the NGFA Secretary.  This complaint should state specifically the nature of the dispute; including the defendant's name and address, applicable contract numbers, date of incident giving rise to the dispute, and the amount of damages claimed.
>
> The case shall incorporate the claims in the original complaint as well as any cross-complaint, counterclaim, or offset as set forth by the defendant, provided that any matters submitted by the defendant must be directly related to the claims in the original complaint.  Any cross-complaint or counterclaim shall be heard as one case with the original complaint.

(Doc. 14, Huerter Decl. Ex. 5).

In its motion to compel arbitration, Indigo argues that its counterclaims are "directly related to the claims in the original complaint" and thus under Rule 2(A) of the NGFA, JES Farms is obligated to arbitrate these claims.  With regard to Count 1 of JES's complaint before this Court, JES Farms has broadly alleged that Indigo did not abide by the terms of the commodities contracts entered into between the parties and that such alleged failures by Indigo caused JES Farms' losses under the contract.  In its answer and counterclaim, Indigo asserts that it does not owe money to JES Farms under the contracts—that it was contractually entitled to offset any payment due and owing to JES Farms for the losses Indigo allegedly incurred as a result of JES Farms' defaults under the contracts.

The Marketplace Seller Agreement gives Indigo the right to offset any payments due and owing to JES Farms. Specifically, the agreement provides that:

> This Agreement is subject to Indigo's right to set-off any debits, claims or obligations from You. To the extent You have any obligation due and owing to Indigo, including any amounts owed for the financing of equipment and/or seed cost, then Indigo may, at its option, deduct any such outstanding amounts from any payment to You for any transaction on the Indigo Marketplace.

(Doc. 1-3). JES Farms alleges in its counterclaims that JES Farms defaulted on the contracts when it failed to deliver commodities in breach of 49 different commodities contracts. (Doc. 1-4). The Marketplace Seller Agreement provides that "the parties contemplate that Indigo will or may owe commodities to third-party buyers and that [JES Farms'] failure to deliver the Commodity, including any failure to deliver within the delivery period, is a default and may result in damages in Indigo." (Doc. 1-3). Under the terms of the Marketplace Seller Agreement, any breaches by JES Farms of its delivery obligations entitle Indigo to payment of the "fair market value for Indigo's interests in any defaulted portion" which includes "the difference between the Purchase Price and the market price at the time of termination and any other losses incurred by Indigo as a result of default." (Doc. 1-3). The Marketplace Seller agreement grants Indigo the right to cancel any transactions without liability for any breach or default by JES Farms of any terms and conditions of the Agreement, any Confirmation, or any transaction. (Doc. 1-3). In the event JES Farms fails to fulfill the sale of the Commodity, the Agreement also grants Indigo the right "to terminate the Agreement (or any particular transaction) without any further obligation thereof, along with any other contracts in existence with the Seller." (Doc. 1-3). The Marketplace Seller Agreement grants Indigo "the right . . . to demand adequate assurance of JES's full performance" wherever it has "reasonable grounds for insecurity." (Doc. 1-3). Indigo alleges that it had reasonable grounds for insecurity when JES's short strategy caused its equity positions in its program to deteriorate, and that JES refused to commit that it would deliver the commodities it was contractually bound to deliver. The Marketplace Seller Agreement provides that JES Farms' "failure to provide such adequate assurance as demanded shall constitute" JES Farms' "repudiation of the Confirmation, and Indigo shall have the right to declare [JES Farms] in default and pursue all legal remedies, including, without limitation, recovery of losses and damages." (Doc. 1-3). Indigo alleges in its counterclaim that it acted reasonably and within its contractual rights to cancel the contracts that JES was in jeopardy of defaulting on. (Doc. 1-4).

The Court finds that under the Arbitration Services Contract, the parties clearly agreed to arbitrate Indigo's counterclaims. The Arbitration Services Contract provides that the parties "agree to comply with all NGFA Arbitration Rules." Rule 2A of the NGFA Arbitration Rules provides that "the case shall incorporate the claims in the original complaint as well as any cross-complaint, counterclaim, or offset as set forth by the defendant, provided that any matters submitted by the defendant must be directly related to the claims in the original complaint." (Doc. 14, Heuerter Decl. Ex. 5). Indigo's counterclaims are directly related to the amount that Indigo claims it is due and owed under the terms of the parties' commodities contracts and the Marketplace Seller Agreement which governs all of the parties' "transactions on the Indigo Marketplace."

It is a different matter with regard to Count 2. In Count 2, JES alleges that Indigo's MPP grain contracts are illegal off-market exchange under the Commodity Exchange Act and are thus unenforceable. As the Court has already discussed, this claim does not fall within the scope of the arbitration provision in the Marketplace Seller Agreement. In examining JES Farms' arbitration complaint and the Arbitration Services Contract, the Court finds that the allegations in Count 2 do not fall within the scope of Arbitration Services Contract. In its Motion to Compel Arbitration, Indigo argues that that JES Farms already consented to have its claim that the MPPs are illegal contracts arbitrated in the NGFA because it presented such arguments in its First Argument to the NGFA. The Court notes that Rule 2(A) of the NGFA Arbitration Rules limits the scope of a claimant's claims to those in the original complaint.[4] Even if the Court considers the arguments put forth by JES Farms in its First Argument to define the scope of JES Farms' complaint, the Court finds that JES Farms did not therein place at issue whether its MPP contracts are illegal off-market exchange under the Commodities Exchange Act. Throughout its First Argument, JES Farms argued that Indigo breached its obligations under the commodities contracts and engaged in fraud and deceit through its agent Jeremy Frost. While JES Farms argued that Indigo represented that that JES Farms was not opening a futures options account, and that there would be no margin calls, JES Farms did not argue that such features rendered the contracts illegal or invalid, but rather that such representations were "false and misleading" and that "Indigo's

---

[4] Rule 2(A) of the NGFA Arbitration Rules provides that the case before the arbitration panel "shall incorporate the claims in the original complaint as well as any cross-complaint, counterclaim, or offset as set forth by the defendant . . . ."

fraudulent actions . . . caused [JES Farms] significant damages in lost grain, and in lost grain revenues." (Doc. 10-6, ¶¶ 3, 9, 34). For these reasons, the Court denies Indigo's motion to compel Count 2.

The Court finds that an issue of material fact exists as well as a question of law as to whether the MPP contracts are illegal off-market exchange under the Commodities Exchange Act thus rendering them the invalid.

### 4. **Motion to Dismiss**

Indigo moves in the alternative to dismiss JES Farms' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court assessing such a motion must accept all factual allegations in the complaint as true and draw all inferences in favor of the nonmovant. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010); *Brooks v. Midwest Heart Group*, 655 F.3d 796, 799 (8th Cir. 2011). Courts consider "plausibility" by " 'draw[ing] on [their own] judicial experience and common sense.' " *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts must " 'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.' " *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010)).

Indigo's motion to dismiss is denied. The Court has already ruled on the merits of Count 1, concluding that Indigo's counterclaims fall within the scope of a valid arbitration clause executed by JES Farms. Indigo moves to dismiss Count 2 on the basis that JES Farms' complaint does not identify a single contract provision that would render it an illegal off-market exchange under the Commodities Exchange Act. The Court finds that JES Farms has stated a claim. The basis of JES Farms' claim is that the MPP contracts operated as illegal off-market exchange under the Commodities Exchange Act. As the Court has stated previously, there are disputed material facts regarding this issue that will be resolved by this Court following further proceedings, together with the Court's determination of the legal issues.

### 5. **Laches**

Indigo argues in opposition to JES Farms' request for a temporary restraining order and preliminary injunction staying the arbitration that such relief is precluded under the doctrine of laches. Indigo argues that JES Farms has known that Indigo would bring counterclaims since January 2021 and has had Indigo's counterclaims since July 2021. (Doc. 8 at 422). Indigo argues that the parties expended significant sums of time and money to investigate the claims, submit two rounds of briefing with hundreds of exhibits, and prepare for an in-person hearing and that JES Farms should be precluded from obtaining injunctive relief as a result of what it argues is its unreasonable delay in objecting to the arbitrability of Indigo's counterclaims.

"Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999). Whether laches applies is in the sound discretion of the district court. *Brown-Mitchell v. Kansas City Power & Light Co.*, 267 F.3d 825, 827 (8th Cir. 2001).

The Court declines to apply the doctrine of laches to foreclose JES Farms' request for injunctive relief. The Court finds that JES Farm had brought its concerns regarding the arbitrability of Indigo's counterclaims to NGFA's attention on several occasions and only once it had been assured that the counterclaims were subject to arbitration, did it file an action in this Court for a stay and temporary restraining order for determination of arbitrability and Commodities Exchange Act compliance.

Accordingly, it is hereby ORDERED that:

1. Indigo's Motion to Compel (Doc. 28) is GRANTED IN PART and DENIED IN PART. JES Farms will be compelled to arbitrate Indigo's counterclaims subject to the Court's ruling on the legality of the MPP contracts; and

2. Indigo's Motion to Dismiss (Doc. 28) is DENIED.

Dated this _____ day of June, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK